# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ALANN B. STEEN *et al.*,

    **Plaintiffs,**

    **v.**                                    **CA 00-3037 (CKK/JMF)**

**THE ISLAMIC REPUBLIC OF IRAN, et al.,**

    **Defendants.**

**FILED**

JUL 1 7 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## REPORT AND RECOMMENDATION

This case was referred to me for Report and Recommendation pursuant to L. Civ. R. 72.3(a). A hearing was held on November 12, 2002, at which plaintiffs submitted testimony and documents in support of their claims. Defendants, having previously been adjudged in default by Judge Kollar-Kotelly, were not present at the hearing.

## BACKGROUND

This is an action arising out of claims by Alann and Virginia Steen for damages resulting from acts of state-sponsored terrorism. This is the third[1] lawsuit to be filed in this court by former professors at the American College in Beirut, Lebanon, who were kidnapped on January 24, 1987 by members of Hizballah, an Islamic terrorist group, acting under the direction and sponsorship of the Islamic Republic of Iran. Robert Polhill, John Turner, and Alann Steen were held together with Dr. Mitheleshvara Singh, another professor at the college, under identically inhumane and degrading conditions.

---

[1] Polhill v. Iran, Civ. Action No. 00-1798;  Turner v. Iran, Civ. Action No. 01-1981



*14*

Alann Steen was held the longest, for 1,775 days.  He was released on December 4, 1991.
During the last months of his captivity, Mr. Steen was chained in a basement in solitary
confinement.  He was not aware that his companions had been freed.  Rather, he feared that they
had been killed.

Many of the facts surrounding the kidnapping of the three American professors are
described in the <u>Polhill</u> and <u>Turner</u>, decisions and need not be repeated here.  Yet, unlike the
named defendants in the <u>Polhill</u> and <u>Turner</u> cases, Mr. & Mrs. Steen also named the Iranian
Revolutionary Guard Corps ("RGC") as a defendant.

Dr. Bruce Tefft, an expert in the field of counter-terrorism, testified that the RGC, or
Pasdaran, operates as an agency of the Islamic Republic of Iran.  Its chief purpose is to export
the Islamic Revolution into other countries and it maintains a strong presence in Lebanon's
Bekka Valley.  The RGC was the entity that formed, funded, and directed Hizballah.  It also
trained and supported Hizballah and often approved individual terrorist actions.  Dr. Tefft further
described instances of Iran's sponsorship of terrorism, noting that the United States negotiated
with the Iranian government for the release of hostages, and that Imad Mugniyah, one of the
world's most wanted terrorists, directed Hizballah's terrorist activities in the 1980's and today
enjoys sanctuary in Iran.

## DISCUSSION

I.      The Foreign Sovereign Immunities Act

It is well-established that a foreign sovereign is immune from the jurisdiction of United
States courts unless one of the enumerated exceptions to the Foreign Sovereign Immunities Act
("FSIA"), 28 U.S.C.A. §§1602-1611 (2003), applies. 28 U.S.C.A. § 1604 (2003).  <u>See e.g.</u>

<u>Stetham v. Islamic Republic of Iran</u>, 201 F.Supp.2d 78 (D.D.C. 2002).  The FSIA explicitly

provides a cause of action for the following:

> personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft
> sabotage, hostage taking, or the provision of material support or resources . . . for such an
> act if such act or provision of material support is engaged in by an official, employee, or
> agent of such foreign state while acting within the scope of his or her office, employment
> or agency.

28 U.S.C.A. § 1605(a)(7) (2003).

In 1996, Congress amended the FSIA through the enactment of the Antiterrorism and

Effective Death Penalty Act of 1996, which abrogates the immunity of foreign states for their

sponsorship of terrorist acts. Pub. L. 104-132, Title II, § 221 (a), (April 24, 1996), 110 Stat.

1241, codified at 28 U.S.C.A. § 1605 (2003).  Congress thus created another exception to foreign

state immunity.  In other words, foreign states that have been officially designated as state

sponsors of terrorism by the Department of State are no longer presumptively immune from

liability under the Act.

The evidence presented to the court established that Mr. Steen suffered personal injuries

as a result of his being taken hostage in Lebanon in 1987.  In addition, the role of the

Revolutionary Guard Corps as Iran's implementing agency has been repeatedly documented.

<u>See</u> Patterns of Global Terrorism 1986 at 22 Iran's Use of International Terrorism, State Dept. at

1 (October 1987).  Together with the Ministry of Information and Security, the RGC applied and

directed the approximately $80 to $100 million that Iran has contributed to Hizballah on an

annual basis.  Iran was designated as a state sponsor of terrorism under section 6(j) of the Export

Administration Act of 1979 on January 23, 1984, and has remained so designated ever since.

Alann Steen was a United States citizen at the time of his kidnapping and captivity.  <u>See</u> 28

U.S.C.A. §1605(a)(7)(A) (2003).  Thus, the dual requirements of 28 U.S.C.A. §1605(a)(7)(A)

3

(2003) are met and, as in other cases brought against Iran under this exception to the FSIA, this court has subject matter jurisdiction over the case.  See e.g., Flatow v. Islamic Republic of Iran, 999 F. Supp. 18 (D.D.C. 1998); Cicippio v. Islamic Republic of Iran, 18 F. Supp. 2d 62 (D.D.C. 1998); Anderson v. Islamic Republic of Iran, 90 F. Supp.2d 107 (D.D.C. 2000); Higgins v. Islamic Republic of Iran, C.A. 99-377-CKK (D.D.C. Sept. 21, 2000).  This court also has personal jurisdiction over the defendants.  The statutory requirements for personal jurisdiction are satisfied:  service was proper and the court has subject matter jurisdiction under the FSIA. See 28 U.S.C.A. § 1330(b) (2003).

The court concludes, therefore, that there is ample evidence that the Islamic Republic of Iran, the Iranian Revolutionary Guard Corps and the Iranian Ministry of Information and Security were responsible for the kidnapping, torture, and captivity of Alann Steen.

II.     The Brutality of Alann Steen's Captivity

Alann Steen was held under the same horrible conditions described in Polhill and Turner. He was chained to a wall, slept on a thin mattress, maintained on a meager diet, and deprived of all contact with the outside world.  These men suffered terribly during their captivity.  Steen testified that upon his release he was unable to walk because he had grown so unaccustomed to activity of any kind.

At one point, Mr. Steen attempted to escape through a window.  Unfortunately the cab he hailed on the street to take him to the airport returned him to his captors.  As punishment, he was beaten and subsequently moved to a new location.

The guards routinely inflicted acts of particular cruelty upon Mr. Steen, whom they beat and threatened to shoot on several occasions.  Shortly after the kidnapping, the guards repeatedly struck and shoved a handcuffed Mr. Steen until he fell, striking his head on a low table or other

piece of furniture.  Days of intense pain ensued until a doctor was consulted.  The doctor

misdiagnosed Mr. Steen as suffering from high blood pressure.  As a result, the medication

prescribed by the doctor left Mr. Steen immobile for several days.

Mr. Steen still suffers from the residual effect of that head injury.  Treatment in the form

of medication and surgery have met with varying degrees of success.  His treating neurologist,

Dr. Don Thai, testified that Steen suffers from a degenerative condition, which results in

progressive damage to Steen's brain tissue.  Dr. Thai further testified that it was extraordinary

that Mr. Steen was able to continue to function in society despite having been diagnosed two

years ago with dementia.  According to Dr. Thai, the onset of dementia would not be expected in

a person of Steen's intelligence until age 80.  Now, however, Dr. Thai predicts that Mr. Steen's

progressive injury will result in a further deterioration of his health in the coming years and the

eleven years of seizures Mr. Steen has already experienced as a result of his head injury will

continue.  According to Virginia Steen, each episode leaves her husband utterly exhausted.

In addition, Mr. Steen also suffers from an ongoing loss of memory.  For example,

following his release he delivered a speech at Albion College in which he described his

captivity, depicting in graphic detail the instances of torture inflicted by his captives:

> I can remember thirty-four months of handcuffs and chains.
> Thirty-four months of a thin sponge mattress that got thinner by
> the day....Thirty-three months of no news.  Thirty months of
> bombings, shellings, fire fights, and no place to hide.  Twenty
> months of being kicked, punched and pummeled without reason.
> Thirteen months of a shower every three months.  Thirteen months
> of a near starvation diet.  Twelve months of virtually nothing to
> read.
>
> ***
>
> Levi returned with a .22 automatic pistol, with silencer.
> Though there was no slit for a mouth in his mask, I knew he was

smiling; I could see it in his eyes. Quickly, he kneeled down. He put the pistol to my chest and looked into my eyes. Can you forget death waiting to happen? It was in his eyes. Red-brown they were, but dilated iris in that room with the morning sun trying to get through those dusty blinds. Flashing, quivering, but not blinking nor moving, his eyes never looked at Turner and Polhill, only me.

Then, without looking away, he propped up my left leg on my pillow and placed the silenced barrel on my knee and pulled back the hammer. He had no permission to kill me, but he could take off a kneecap, perhaps. He looked deep into my eyes for a reaction. I tried to look defiant. . . well, maybe, not too scared. He wouldn't do anything. He couldn't. Where his mouth should have been behind his mask began to darken as if with moisture, as if with drool.

A moment later his look turned to what might have been called disgust. He cracked my knee with the pistol butt and ran out of the room. Two minutes later he was back, this time with handcuffs which he fastened too tightly around my wrists and undid my chain. He pulled me to my feet and directed me to the other side of the room, where he chained me by the throat to a hasp bolted to the floor. Turner and Polhill had been here before me, and we all knew what would happen next. Levi took off a black hard-rubber house slipper and smacked me twice on my left shoulder before leaving.

Alann Steen, Address at Albion College (Plaintiff's Exhibit 12)

Today, Alann Steen has no memory of those events.

III.   Damages

    A.   Compensatory

        1.   Alann Steen

As to compensatory damages, Steen merely seeks an award of damages for pain and suffering. See also Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003)(holding that in order to obtain an award for damages for economic loss, "a FSIA plaintiff must prove that the projected consequences are 'reasonably certain . . . to occur, and must prove the amount of

damages by a 'reasonable estimate'"). For pain and suffering, the damages awarded by judges of this court in similar cases provide guidance for an award of damages in this case. This district has developed a formula for awarding damages in cases where victims were held hostage by terrorist organizations. Typically, the court has awarded former hostages or their estates roughly $10,000 for each day of captivity subject to adjustments for extraordinary circumstances. See Stethem v. Islamic Republic of Iran, 201 F.Supp.2d at 88-89; Jenco v. Islamic Republic of Iran, 154 F.Supp.2d 27, 37 (D.D.C. 2001); Anderson v. Islamic Republic of Iran, 90 F.Supp.2d at 113. If this same formula is applied to Mr. Steen's case, the court should award him $17,750,000 because he was held from January 24, 1987 until December 3, 1991, a total of 1775 days.

In comparison to other cases where hostages were eventually released and able to return to their normal lives, the aggravated acts of violence inflicted upon Alann Steen were unusual, perhaps motivated by suspicion that Mr. Steen was working for the Marine Corps or the CIA. Other hostages, despite being held in primitive conditions, reported receiving better treatment.[2] Moreover, the injuries suffered by Alann Steen are unique in comparison to other hostages. His frequent seizures have led to a deterioration of his health, which has been treated by progressively more invasive medical procedures. This pattern will continue as he becomes less able to care for himself.

I, therefore, recommend that the court enhance Steen's award, as was done in Polhill, to reflect the particular circumstances of Steen's captivity and the continuing harm to his health. Specifically, I recommend that Steen receive $27,750,000; a rate of $10 thousand for each day

---

[2] For example, Terry Anderson testified that he was rarely beaten. See Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d. 107 (D.D.C. 2000).

plus an additional $10 million for the extraordinary brutality and long-term health effects that he has suffered and will continue to suffer.

      2.    Virginia Steen

Virginia Steen met her husband-to-be when she accepted a faculty position teaching Art History at the America College in Beirut. They had a loving relationship, which flourished amid the growing changes of living conditions in Beirut. She was present in the room when her husband was kidnapped. She and other faculty members had been duped into assembling for a meeting on "security" and then the speakers turned out to be members of Hizballah.

For nearly five years, her only news of her husband came through photographs and videotapes released by his captors. She experienced great pain as a result of her separation from "her best friend" and suffered extreme anguish upon watching the dramatic deterioration of his condition over time.

With respect to Virginia Steen's claims for solatium, I will again recommend that the court follow the precedent set by other judges of this court who have awarded family members damages based on a showing that the extreme and outrageous conduct inflicted against a loved one also causes severe emotional distress to those close to the victim. See Stethem v. Islamic Republic of Iran, 201 F.Supp.2d at 89; Wagner v. Islamic Republic of Iran, 172 F.Supp.2d 128, 136, n.11 (D.D.C. 2001); Jenco v. Islamic Republic of Iran, 154 F.Supp.2d at 35-36. In this case, the defendants' conduct was patently outrageous and the emotional distress caused to Virginia Steen is undeniable. I recommend, therefore, that the court find that Virginia Steen is entitled to damages for solatium. $10 million was awarded to spouses in the Polhill and Turner claims. I recommend that the court enhance that figure to $15 million to compensate Mrs. Steen

for the additional burden she bears as a caregiver for her husband in light of his worsening medical condition and in light of the fact that he was held longer than the other hostages.

       B.    <u>Punitive Damages</u>

Again, following the method used by several judges of this court in similar cases, I recommend that the court award punitive damages in an amount equal to roughly three times defendants' estimated annual budget for their support of terrorism. <u>See</u> <u>Stethem v. Islamic Republic of Iran</u>, 201 F.Supp.2d at 92-93; <u>Anderson v. Islamic Republic of Iran</u>, 90 F.Supp.2d at 1.13-14; <u>Higgins v. Islamic Republic of Iran</u>, 2000 WL 33674311 at *8-9 (D.D.C. Sept. 21, 2000). <u>See</u> <u>also</u> <u>State Farm Mutual Automobile Insurance Company v. Campbell</u>, 123 S.Ct. 1513, 1524 (2003)(holding that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the . . . goals of deterrence and retribution"). According to Dr. Tefft, during the time period in question, the RGC and the MOIS spent approximately $80 to $100 million per year in support of the operations of Hizballah and its terrorist activities. Based upon this estimate, I recommend that the court assess punitive damages against defendants the Islamic Revolutionary Guard Corps and the Ministry of Information and Security, jointly and severally, in the amount of $300,000,000, to be awarded to plaintiff.

<strong>CONCLUSION</strong>

For the reasons articulated above, I recommend that plaintiffs be awarded the following damages:

| | |
|---|---|
| 1. Alann B. Steen | $ 27,750,000 |
| 2. Virginia Steen | $ 15,000,000 |
| <u>3. Punitive Damages</u> | <u>$300,000,000</u> |
| Total | $342,750,000 |

9

Failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations. See Thomas v. Arn, 474 U.S. 140 (1985).


JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated: 07/12/03